Filed 7/16/25  P. v. James CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C099482 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE003105) |
| v. | |
| RUSSELL JAMES, | |
| Defendant and Appellant. | |

A jury convicted defendant Russell James of robbery, two counts of attempted armed robbery, two counts of assault with a semiautomatic firearm, unlawful firearm possession, and resisting a peace officer.  The jury also found true various firearm enhancements.  After finding true that James had two prior strikes under the Three Strikes law and prior serious felony convictions, the trial court sentenced him to an aggregate prison term of 74 years, plus 75 years to life.

1

On appeal, James contends that his trial counsel provided ineffective assistance by failing to timely request mental health diversion. He also argues that his convictions for assault with a semiautomatic firearm were not supported by substantial evidence. He further claims that the trial court abused its discretion in declining to dismiss the firearm and prior serious felony enhancements. We reject James's claims of ineffective assistance and insufficient evidence but conclude that remand for resentencing is required.

BACKGROUND

An amended information charged James with one count of robbery (Pen. Code, § 211; count one), two counts of attempted robbery (§§ 211, 664; counts two and four), two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts three and five), one count of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count six), and one count of misdemeanor resisting a peace officer (§ 148, subd. (a)(1); count seven).[1] As to the robbery and attempted robbery charges, the People further alleged that James personally used a firearm (§ 12022.53, subd. (b)) and, as to the assault charges, that James used a semiautomatic firearm (§ 12022.5, subds. (a) & (d)). The People additionally alleged that James had suffered prior strike convictions (§§ 667, subds. (b)-(i), 1170.12) and that these were prior serious felony convictions (§ 667, subd. (a)). Multiple aggravating circumstances were also alleged.

The first five counts in the information arose from a string of three robberies or attempted robberies committed within a short distance of each other over a two-week period in October 2020. Each incident was captured on video surveillance cameras, and the surveillance footage of each incident was played for the jury at trial.

---

[1] Undesignated statutory references are to the Penal Code.

The first incident (alleged as count one) was the robbery of a convenience store around 9:00 p.m. on October 3, 2020. According to testimony and video surveillance footage introduced at trial, a man slowly walked up to the entrance of the store, nodded to the store clerk working at the front counter, took a beverage from a refrigerator, and walked back to the front counter. The clerk was counting out cash from the register, preparing to transfer it to the safe. The man walked up to the front counter, drew a handgun from his pocket, and pointed it straight out in front of him at the clerk, who was still handling the cash. The man demanded that the clerk give him the money. The clerk complied, handing over $219. When the man demanded more, the clerk told him he did not have any. When asked whether he saw the man present in the courtroom, the clerk said he did not. The clerk also testified that he did not know the difference between a semiautomatic handgun and a revolver, but he described the gun used in the robbery as black with a red laser light coming out of the front.

When shown an image of the gun used in this robbery during a postarrest interview months later, James identified the gun as a .380-caliber "Taurus" firearm, without prompting. The lead detective for the case also gave his own description of the gun. When shown a close-up image of the man pointing the firearm at the store clerk, the detective testified that the pictured gun appeared black, with some chrome or lighter coloring on the slide barrel and an attachment that appeared to be a laser. The detective also testified that the gun pictured in the surveillance footage looked identical to a gun shown in a photo that investigators had discovered on a social media account in James's name. The social media photo showed a black handgun resting on a pile of cash alongside other items on a table. The detective described the handgun in the social media photo as "unique" based on its subcompact size and its laser attachment on the trigger guard. He testified that the gun in the social media photo was the "style of firearm [that] was observed in video surveillance and described by victims as what the suspect had."

3

In the next incident (alleged as counts two and three), a man was assaulted at gunpoint on October 11, 2020, outside of a grocery store located less than a mile away from the convenience store robbed the week before. At about 6:00 p.m. that day, D.K. and his wife drove up to the grocery store in his convertible and parked a few spaces away from the front entrance. D.K.'s wife went into the store to shop while D.K. stayed seated in the driver's seat of the parked car. The convertible's top was down, and he was looking at his phone when he felt a bump on his shoulder and heard someone say something like, "Give me the money, man." D.K. looked up and saw a man standing by the driver's side door, displaying a gun held in his right hand, near his crotch. The man held the gun "[j]ust a few inches" from D.K., pointing it toward him at various times. The man kept repeating his demand for money, and D.K. put his hands up and explained that he did not have his wallet with him and did not have any money. The man punched D.K. in the face, knocking off his glasses. D.K. was not sure if he was hit with a fist or with the gun but testified that it felt like a fist. A store employee appeared nearby, and the assailant ran away. At trial, D.K. identified James as the assailant.

Regarding the gun used in the incident, D.K. testified that it "pretty clearly[] seemed to be a semiautomatic" handgun, given its "squarish" shape and lack of a cylinder. In answer to a question by the prosecutor, D.K. explained that a revolver would be more like a "cowboy gun," whereas a semiautomatic gun would be the type that a police officer or member of the military carries, and the gun used against him was more like the latter. He further testified that the gun looked "exactly like" the one pictured in People's Exhibit 9 and looked "the same" as the one pictured in People's Exhibit 10. People's Exhibits 9 and 10 were pictures of a firearm that police recovered during James's eventual apprehension. That gun, which was produced at trial and admitted into evidence, was identified by two detectives as a .380-caliber Taurus firearm with a crimson trace laser on the trigger guard.

4

The third incident (alleged as counts four and five) occurred on October 15, 2020, less than a week after the assault of D.K., outside of a pizza shop located within one mile of the previous incidents. That evening, after dark, M.H. and a friend drove to the shop to pick up a pizza they had ordered. They parked in the parking lot, and the friend went inside, while M.H. remained in the car's front passenger seat, looking at her phone. Suddenly, the passenger side door was "ripped open" by a man who "put a gun in [her] face" and told her to give him everything she had and not to scream. When M.H. told the man that she did not have anything, he hit her in the lip, causing it to bleed. M.H. used a downward "chopping motion" to demonstrate how the man struck her, and she testified that he hit her with the gun or at least with the same hand that was holding the gun. M.H. told the man that someone was coming around the corner, and he immediately walked away.

M.H. testified that the man held the gun "very close" to her, less than a foot away, with the barrel facing her head. M.H. recalled that the gun "kind of looked like a .22"; it was very small, "all black," and had a red laser that kept shining on her. M.H. stated that she did not know the difference between a revolver and a semiautomatic handgun. The prosecutor showed her People's Exhibit 10, the photograph of the Taurus firearm recovered during James's apprehension, and asked whether she recognized it in any way. M.H. responded, "I don't think so. I think it was more black." M.H. identified James as the assailant.

The police were called shortly after each of these three incidents, and they decided to investigate all three together based on their nearby locations and the similarity of the modus operandi, suspect descriptions, and the firearm that was used. The lead detective testified that, based on the video surveillance and victim statements, the suspect appeared to be wearing the "same type of clothing, using the same type of firearm, and executing his crime in the same manner." Law enforcement created crime bulletins using still

5

images from the surveillance footage, and after some initial investigation, the case went cold.

A few months later, in February 2021, the police received an anonymous tip identifying James as a possible suspect. Detectives found James's record in law enforcement databases, as well as a public social media account in his name. They believed the photos of James in the databases and on the social media account matched the suspect's physical appearance based on the video surveillance.

The same day the anonymous tip came in, law enforcement followed James into a supermarket, and a brief chase ensued. As a detective turned down a store aisle, he saw James reaching his arm toward the back of a shelf as though he were trying to hide or discard an item. At the same time, the detective heard the sound of metal against metal, coming from the area of James's extended hand. After James was arrested, the detective searched the shelves and found the firearm that was later identified at trial as the Taurus firearm.

Both the apprehending detective and the lead detective described the gun as "unique." The apprehending detective had seen only one or two like it out of the hundreds of firearms he had observed over 16 years.

Another detective demonstrated for the jury how the red laser light on the firearm activated with slight pressure on the button. The detective testified that it was a semiautomatic handgun and that the magazine was what made it semiautomatic. The detective contrasted the handgun with a single-action revolver, which would have a cylinder instead of a magazine and the hammer would have to be pulled back before each shot.

In August 2022, the jury convicted James on all counts and found true each of the firearm enhancements.

James waived his right to a jury trial on the aggravating circumstances and prior convictions. For reasons not fully disclosed by the record, the court trial on the aggravating factors and prior convictions and sentencing were not held until July 2023.

At that hearing, the trial court found the aggravating factors and prior convictions true, declined James's requests to dismiss the enhancements and prior strike convictions, and sentenced him to an aggregate prison term of 74 years, plus 75 years to life.

James timely appealed.

DISCUSSION

I.

We first address James's contention that his trial counsel provided ineffective assistance by failing to timely request mental health diversion under section 1001.36.

A.

In May 2023, about nine months after the jury returned its guilty verdicts, James's counsel filed an application for mental health diversion under section 1001.36 along with a sentencing memorandum and a motion to strike James's prior strikes under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. In the application for diversion, counsel asserted that James suffered from "Unspecified Schizophrenia and Other Psychotic Disorder and substance abuse disorder," both of which "can be addressed with various treatment modalities, including both pharmaceuticals and psychotherapy." Counsel also separately filed (under seal) a copy of a March 2023 letter from a licensed psychologist who had interviewed James by telephone in February 2023 for an unrelated civil matter. The letter conveyed that James had grown up in "an extremely high stress and neglectful environment" due to parental drug abuse, that he had been sexually molested at a youth camp, and that he exhibited behaviors and symptoms consistent with childhood sexual abuse and "with a diagnosis of Posttraumatic Stress Disorder" (PTSD). The psychologist described James's high stress childhood as having "negatively affected the development of his brain's ability to respond to any high stress and common, everyday stress

7

situations." She further described the trauma from James's childhood sexual abuse as having "intensified the effects of his already damaged ability to respond to any form of stress."

About two weeks after James's counsel filed the diversion request, the California Supreme Court decided *People v. Braden* (2023) 14 Cal.5th 791, in which it resolved a conflict among the Courts of Appeal regarding when in a criminal proceeding a defendant could move for mental health diversion. *Braden* disagreed with courts that had held that defendants could seek mental health diversion up until the return of the verdict or until sentencing and entry of judgment. (*Id.* at pp. 800-801, 808, 819.) The state high court concluded instead that a diversion request had to be made "before *the process* of adjudicating the charges begins, i.e., before jeopardy attaches at trial or the defendant enters a plea of guilty or no contest, whichever occurs first." (*Id.* at p. 805.) "[J]eopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn." (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 712.)

At the July 2023 sentencing hearing, James's counsel acknowledged that, as the People had argued in their opposition to James's diversion request, mental health diversion was "no longer an option" in light of *Braden*. Counsel instead orally moved for a new trial based on ineffective assistance of counsel so that the case could be returned to "square one" and James could timely request mental health diversion. Counsel asserted that "now that the law has changed, [that] is something that I should have done before."

The trial court denied the motion for a new trial. The court stated, "I think to the extent there would have been a request for pretrial diversion on the part of the Defendant, I do not believe the Defendant would have been granted such pretrial mental health diversion given his record and given the current offenses and for the reasons stated by the People in their written brief." The court further explained that, to the extent any diversion request would have been successful, the court did not view a motion for a new

8

trial based on ineffective assistance as the appropriate remedy, observing that there may be other remedies, such as appellate relief, for any demonstrated ineffective assistance of counsel.

B.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must show " 'that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 736; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687.) "A 'reasonable probability' is one that is enough to undermine confidence in the outcome." (*People v. Dennis* (1998) 17 Cal.4th 468, 541.) A defendant " 'must carry his burden of proving prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' " (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147, quoting *People v. Williams* (1988) 44 Cal.3d 883, 937.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, at p. 697.)

James argues that his counsel performed deficiently by failing to seek mental health diversion before trial and that there is a reasonable probability that the trial court would have granted a timely diversion application. We conclude that, even if counsel performed deficiently, James has not demonstrated a reasonable probability that he would have been granted mental health diversion if counsel had made the request before trial began.

As an initial matter, we assess prejudice based on the version of section 1001.36 that was in effect throughout the period from October 2021 when counsel began

9

representing James through August 2022 when trial started—the last time at which an application for pretrial diversion would have been timely and the period in which James argues counsel performed ineffectively.[2]  During that period, a defendant was eligible for diversion if six criteria were satisfied:  (1) the defendant suffered from a qualifying mental disorder; (2) the disorder was a "significant factor in the commission of the charged offense"; (3) a mental health expert had opined that the defendant's symptoms would respond to treatment; (4) the defendant consented to diversion and waived the right to a speedy trial; (5) the defendant agreed to comply with treatment as a condition of diversion; and (6) "the defendant [would] not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community."  (Former § 1001.36, subd. (b)(1)(A)-(F).)

The record supports that James would likely have shown that he satisfied the first criterion:  that he suffered from a qualifying mental disorder.  (See former § 1001.36, subd. (b)(1)(A).)  Although the trial court did not make a finding that James had a mental disorder, it is reasonably probable the court would have been satisfied by the psychologist's letter stating that his behaviors and symptoms were consistent with a diagnosis of PTSD, which was (and is) one of the mental disorders the statute expressly included as a qualifying diagnosis.  (*Ibid.*; see current § 1001.36, subd. (b)(1).)

James has not shown on this record, however, that he would have been able to satisfy at least two other requirements of the diversion statute then in effect:  that his qualifying mental disorder was a "significant factor in the commission of the charged

---

[2]  Although there were two versions of the statute in effect during this period, we refer to both collectively as the former version, given that they were identical in all respects relevant here.  (Stats. 2019, ch. 497, § 203 [eff. Jan. 1, 2020 through June 29, 2022]; Stats. 2022, ch. 47, § 38 [eff. June 30, 2022 through Dec. 31, 2022].)  The amendment effective June 30, 2022 only added an exception to one of the eligibility criteria not discussed here (former § 1001.36, subd. (b)(1)(E), as amended by Stats. 2022, ch. 47, § 38).

offense" and that he would not "pose an unreasonable risk of danger to public safety." (Former § 1001.36, subd. (b)(1)(B) & (F).) With respect to the first, the former version of section 1001.36 permitted a trial court to find this criterion satisfied if, "after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense," the court could conclude that the defendant's mental disorder "substantially contributed" to his involvement in the charged offenses. (Former § 1001.36, subd. (b)(1)(B).) We conclude that James has not made such a showing because the record in this case lacks evidence that a mental health issue substantially contributed to the offenses. At the preliminary hearing, law enforcement officials described for each incident the suspect's conduct as reported by witnesses and as shown in the surveillance video footage. There was no mention of the suspect behaving erratically either before or after drawing his gun on each victim. Indeed, according to one officer's description, just before robbing the convenience store, the suspect "casually waved" at the store clerk and browsed around the store. The only record evidence of James's symptoms—the psychologist's letter—primarily emphasized James's inability to respond to stressful situations or to modulate his emotions and behaviors. None of the evidence regarding the charged felony offenses suggests that they stemmed from a stressful situation or encounter that prompted James to assault the victims and demand their property. Further, in an interview with a probation officer, James expressed that he had been under the influence of drugs and that the attacks were " 'mindless acts of violence to feed [his] hunger and drug addiction.' "

James argues that, under the rule of *In re Estrada* (1965) 63 Cal.2d 740, we should apply the current version of the statute, which contains a rebuttable presumption—first added in January 2023 (Stats. 2022, ch. 735, § 1)—that a defendant's mental illness

11

contributed to the offense.  (§ 1001.36, subd. (b)(2).)  He maintains that because this case is non-final, we must presume that his mental health issues contributed to the charged offenses.  We disagree because the question here is not the retroactive application of revisions to the statute but whether, under *Strickland*, he can show a reasonable probability that he would have been granted diversion under the statute as it stood before his trial in 2022.

The record also fails to support James's contention that he could have established that he would not pose "an unreasonable risk of danger to public safety" if treated in the community.  (Former § 1001.36, subd. (b)(1)(F).)  Former section 1001.36, subdivision (b)(1)(F), like the current version of the statute (§ 1001.36, subd. (c)(4)), provides that "unreasonable risk of danger to public safety" carries the same definition used in section 1170.18, which defines the phrase as "an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667."  (§ 1170.18, subd. (c).)  The so-called "super strikes" listed in that portion of section 667 are "murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14."  (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1150-1151; see § 667, subd. (e)(2)(C)(iv).)  In determining whether a defendant poses an unreasonable risk of committing a super strike as defined in the statute, a trial court may "consider any factors it deems appropriate when assessing dangerousness, and [section 1001.36] expressly includes 'the defendant's violence and criminal history' and 'the current charged offense' among the permissible factors." (*People v. Graham* (2024) 102 Cal.App.5th 787, 799; see former § 1001.36, subd. (b)(1)(F).)

Courts of Appeal have affirmed findings of dangerousness under section 1170.18 "where the petitioners had long criminal histories involving violent felonies." (*People v. Moine* (2021) 62 Cal.App.5th 440, 451.) That is the situation here. After decades of criminal offenses, including prior armed robberies, James demanded money at gunpoint from three victims and physically struck two of them in the face. In denying James's motion for a new trial, the trial court observed that it did not believe it would have granted James pretrial diversion specifically because of "his record and given the current offenses." Indeed, it is difficult to imagine this trial court, which repeatedly emphasized its concern with James's present dangerousness, finding that someone who had tried to rob several people at gunpoint after a long history of similar offenses would not be likely to commit a super strike such as attempted murder under similar circumstances if treated in the community. (See *People v. Hall* (2016) 247 Cal.App.4th 1255, 1266 [reasonable to infer the defendant posed a risk of "using deadly force" where his history of felony convictions spanned nearly two decades, including two prior robbery convictions, and he had pressed a knife to the victim's stomach in the most recent offense].)

James argues that, under *People v. Frahs* (2020) 9 Cal.5th 618, 638, "the appellate record need not definitively satisfy each of the eligibility factors to merit remand for reconsideration of diversion." In *Frahs*, the state Supreme Court held that section 1001.36 was an ameliorative statute that applies retroactively to cases in which the judgment was not yet final on appeal when the statute took effect. (*Frahs*, at p. 624; see *People v. Braden*, *supra*, 14 Cal.5th at p. 801.) The *Frahs* court concluded that a conditional limited remand is warranted when "the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion—the defendant suffers from a qualifying mental disorder (§ 1001.36, subd. (b)(1)(A))." (*Frahs*, at p. 640.) The court reasoned that requiring a defendant to demonstrate satisfaction of all eligibility requirements would be "unduly onerous and impractical" when the record on appeal was "unlikely to include information pertaining

13

to several eligibility factors" for a defendant who "was tried and convicted before section 1001.36 became effective." (*Id.* at p. 638.)

The reasons behind the rule announced in *Frahs* are not present here. Because section 1001.36 was in effect throughout James's criminal proceedings in the trial court, this is not a case about retroactivity. And the standards for obtaining relief on a claim of ineffective assistance of counsel are different from those that apply in the retroactivity posture of *Frahs*. (See *People v. Doron* (2023) 95 Cal.App.5th 1, 10 [retroactive remand standard].) As noted above, to prevail on an ineffective assistance claim, a defendant must show prejudice " 'as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' " (*People v. Montoya*, *supra*, 149 Cal.App.4th at p. 1147.) And we must "analyze prejudice based on the record." (*People v. Banner* (2022) 77 Cal.App.5th 226, 237; see *id.* at p. 239 ["We must rest our analysis not on a hypothesis but on evidence in the record"].) To demonstrate prejudice from counsel's asserted ineffectiveness in failing to seek mental health diversion before trial, when such diversion was available and when counsel did seek diversion posttrial, James must show a reasonable probability that he would have been found to have satisfied all of the statutory criteria for mental health diversion as they existed before his trial. For the above reasons, he has failed to do so. We therefore reject his ineffective assistance of counsel claim. (See *id.* at p. 239 [rejecting ineffective assistance claim where the defendant could not prove prejudice because he could not prove the trial court would have found him eligible for diversion].)

## II.

James additionally contends that insufficient evidence supported his two convictions for assault with a semiautomatic firearm under section 245, subdivision (b): the assault of D.K. charged in count three and the assault of M.H. charged in count five.

Section 245, subdivision (b) proscribes the commission of "an assault upon the person of another with a semiautomatic firearm." "An assault is an unlawful attempt,

14

coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "[I]n other words, it is an attempt to commit a battery." (*People v. Rocha* (1971) 3 Cal.3d 893, 899.) As to mental state, assault "only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.) The defendant "must not only intend to commit a battery [citation]; he must also have the present ability to do so." (*People v. Wolcott* (1983) 34 Cal.3d 92, 99.) The present ability element of assault "is satisfied when 'a defendant has attained the means and location to strike immediately,' " meaning "on the given occasion." (*People v. Chance* (2008) 44 Cal.4th 1164, 1168, 1172; see also *People v. Valdez* (1985) 175 Cal.App.3d 103, 112 ["to be guilty of assault a defendant must have maneuvered himself into such a location and equipped himself with sufficient means that he appears to be able to strike immediately at his intended victim"].)

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820.) We " 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) " 'A reviewing court neither reweighs [the] evidence nor reevaluates a witness's credibility.' [Citation.] Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]" ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 378.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 639.)

A.

In challenging the sufficiency of the evidence that he committed assault upon D.K. and M.H., James argues that his convictions should be overturned because the evidence showed that he displayed and pointed a firearm at the victims, not that he struck either victim with the gun or that the firearm was capable of discharging at the time. We reject this claim because the record discloses abundant evidence that, in each encounter, James had attained the means and location to inflict violent injury upon the victims by using his gun as a club or bludgeon. (§ 240; *People v. Chance*, *supra*, 44 Cal.4th at p. 1168.)

As this court has previously held, "[a] person may commit an assault under [section 245, subdivision (b)] by using the gun as a club or bludgeon, regardless of whether he could also have fired it in a semiautomatic manner at that moment." (*People v. Miceli* (2002) 104 Cal.App.4th 256, 270.) Numerous cases recognize this principle. (*People v. Chance*, *supra*, 44 Cal.4th at p. 1172, fn. 7 [referencing "the rule that assault cannot be committed with an unloaded gun, *unless the weapon is used as a bludgeon*" (italics added)]; *People v. Webb* (2023) 90 Cal.App.5th 660, 666 ["There can be no present ability to commit an assault with an *unloaded* gun (*unless it is used as a club or bludgeon*)" (second italics added)]; *People v. Mosqueda* (1970) 5 Cal.App.3d 540, 544 ["if a person points an unloaded gun at another, *without any intent or threat to use it as a club or bludgeon*," he does not commit assault under § 240 (italics added)].) And our Supreme Court has found substantial evidence to support a conviction for assault with a deadly weapon where the defendant struck two victims with a gun and "approached sufficiently near [another] to have the present ability to injure [him] in the same manner." (*People v. Fain* (1983) 34 Cal.3d 350, 357, fn. 6.)

Here, in his attempt to rob D.K. outside the grocery store, the video surveillance showed that James stood right beside D.K., leaning over the door of the convertible with D.K. still seated. James held his gun just "a few inches" from D.K. and punched him in the face. Although D.K. testified that it felt like James struck him with his fist, that was

sufficient evidence that James was positioned to have done the same with the gun. (See *People v. Chance*, *supra*, 44 Cal.4th at p. 1168.) James argues that simply holding the weapon, without an attempt or threat to use it to strike D.K., is not enough, citing *People v. Rodriguez* (1999) 20 Cal.4th 1 at page 11, footnote 3 for the proposition that assault is not established just because a weapon "*could be* used as a bludgeon." That footnote cites a "long line of California decisions hold[ing] that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person." (*Ibid.*) But that line of cases deals with scenarios where the defendant is pointing a gun at someone beyond his arm's reach. (See *People v. Fain*, *supra*, 34 Cal.3d at p. 356 [pointed gun from distance of about five feet]; *People v. Sylva* (1904) 143 Cal. 62, 63 [distance of over 15 feet]; *People v. Lee Kong* (1892) 95 Cal. 666, 669 [under our assault statute, "it cannot be said that a person with an unloaded gun would have the present ability to inflict an injury upon another many yards distant"]; *People v. Valdez*, *supra*, 175 Cal.App.3d at p. 109 [pointed gun at victim behind bulletproof glass].) In contrast here, there was credible evidence that James pointed a gun at D.K. from inches away, showing that he had attained the means and location to strike immediately. (*Chance*, at p. 1168.)

The same is true of James's encounter with M.H. M.H. testified that James "put [the] gun in [her] face," less than a foot away. She further testified that James hit her with the gun or at least with the same hand that was holding the gun. This was sufficient evidence for the jury to conclude that, at a minimum, James had attained the means and location to use the gun as a bludgeon against her. (*People v. Chance*, *supra*, 44 Cal.4th at p. 1168.)

Furthermore, there was sufficient evidence that James committed these assaults using his gun as a firearm. Notwithstanding James's correct observation that there was no affirmative evidence that the firearm was "capable of discharging" during either incident, James's words and conduct during both encounters allowed the jury to infer that

17

the gun was loaded and operable. (See *People v. Rodriguez*, *supra*, 20 Cal.4th at p. 13 ["A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon"].) During each confrontation, James pointed his gun at the victim at close range, while repeatedly demanding their money or belongings. On these facts, the jury could reasonably determine that the gun was capable of firing. It could also "reasonably infer from the fact that [James] aimed his gun and demanded compliance with his instructions that he had the requisite intent to use the gun if the victims failed to comply." (*People v. Fain*, *supra*, 34 Cal.3d at p. 356.)

B.

James additionally contends that there was insufficient evidence that the firearm he used against M.H. was semiautomatic. The use of a semiautomatic firearm is, of course, a necessary element of the offense of assault with a semiautomatic firearm (§ 245, subd. (b)). (*People v. Le* (2015) 61 Cal.4th 416, 427; see *People v. Hardy* (2021) 65 Cal.App.5th 312, 331 [conditionally reversing § 245, subd. (b) conviction where only evidence of firearm's semiautomatic nature was improperly admitted].) In describing the gun used against her, M.H. testified that it "kind of looked like a .22" and that it was very small, "all black," and had a red laser that kept shining on her. She stated that she did not know the difference between a revolver and a semiautomatic handgun. And when asked whether she recognized the gun shown in People's Exhibit 10, which was a photo of the gun recovered during James's apprehension, she answered, "I don't think so. I think it was more black." James argues that this equivocal testimony was not sufficient to establish that the firearm used in the assault of M.H. was semiautomatic.[3]

---

[3] For the first time in his reply brief, James briefly asserts that the evidence failed to establish that the weapon used against either D.K. or M.H. was "capable of firing a round, discharging the casing, and chambering a new round with a single trigger pull," citing the definition of a semiautomatic firearm that our Supreme Court gave in *In re*

18

We reject James's claim because the trial evidence, taken as a whole, was sufficient for the jury to conclude that James used the same semiautomatic firearm against M.H. that he had used in the other two incidents over the previous two weeks and that was recovered during his arrest some four months later. To begin with, there was sufficient evidence that the gun that James used in the two incidents before the assault on M.H. was a semiautomatic firearm. The gun used in the initial convenience store robbery was clearly displayed on the video surveillance footage and was identified—by James himself—as a .380-caliber Taurus that detectives explained is a semiautomatic handgun. The convenience store clerk testified that the gun pointed at him emitted a red laser light, as did the Taurus firearm during the courtroom demonstration. Although the clerk did not identify James as his assailant, the social media photo of a "unique" gun identical to the one used at the convenience store linked James to this incident, along with further similarities between his appearance and the gunman's. The gun used about one week later in the attempted robbery of D.K. outside the grocery store could not be seen on video surveillance footage, but D.K. testified that the gun used against him was semiautomatic and looked "exactly like" the one pictured in People's Exhibit 9—a photograph of the firearm recovered during James's apprehension, which detectives likewise identified as a .380-caliber Taurus (a semiautomatic weapon, according to a detective) with a laser guard attachment.

M.H.'s description of the gun used against her, though less definitive, was consistent with that same firearm. She described the gun she saw as being "very small,"

---

*Jorge M.* (2000) 23 Cal.4th 866, 874, footnote 4. This contention is forfeited both for failure to raise it in the opening brief and for failure to develop any argument that proof of the use of a semiautomatic firearm requires specific, technical evidence of the firearm's mode of operation. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [issue raised for first time in reply brief was forfeited]; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [absence of cogent legal argument or citation to authority forfeits contention].)

19

"all black," and emitting a red laser. This matches the "subcompact" firearm with a laser attachment on the trigger guard shown in the photo from James's social media account, shown in a photo from the surveillance footage from the convenience store robbery, and shown in the photos of the firearm that D.K. testified looked exactly like the one used against him outside the grocery store. The red color of the laser described by M.H. also matched the red laser light emitted by the Taurus firearm, as demonstrated in the courtroom. It is true, as James emphasizes, that M.H. testified that the gun she saw was "more black" than the one pictured in People's Exhibit 10, but, as the People argue, the jury could reasonably discount this statement in light of the other similarities because the assault occurred when it was dark out.

Further support for the identicality of the gun came from M.H.'s courtroom identification of James as her assailant and the evidence that he had committed a nearly identical attempted robbery just four days prior, using a gun that D.K. testified looked the same as the "unique" Taurus firearm. As shown in the surveillance footage of both incidents, the assailant was wearing a red hat with black lettering and a black brim, long black shorts, and black shoes with red laces. Based on the footage and the victims' testimony, the assailant's conduct was also strikingly similar: waiting outside a business in the same vicinity and identifying a vulnerable target seated alone in a car, approaching them at close range with a gun, demanding they give him money, and then striking them in the face when they did not comply, before leaving at the first sign that he had been spotted. This evidence was sufficient to allow the jury to infer that James was the assailant in both events and that the gun he wielded was the same Taurus firearm.

The jury could also reasonably infer that James possessed that same gun just before his arrest four months later. Although there was no direct evidence that James was seen with the Taurus on that date, the gun was recovered from the supermarket shelves near where he was stopped and there was a contemporaneous clattering when the arresting detective saw James's hand extended into the shelves.

20

In sum, there was sufficient evidence for the jury to conclude that in all three attacks the same individual (James) used the same unique semiautomatic firearm recovered at the supermarket. Thus, there was sufficient evidence for the jury to find that the firearm used against M.H. in the count five offense was semiautomatic.

## III.

James also challenges his sentence, contending that the trial court abused its discretion by failing to dismiss the firearm enhancements and prior serious felony enhancements under section 1385, subdivision (c).

## A.

At James's sentencing hearing, the trial court made findings on the aggravating and mitigating circumstances (James having waived a jury trial on the aggravating factors). The court found true at least six of the aggravating factors that the People alleged: that James was armed with or used a weapon during the offense (Cal. Rules of Court, rule 4.421(a)(2)); that the crimes evinced planning, sophistication, or professionalism (rule 4.421(a)(8)); that James had engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)); that his prior convictions or sustained juvenile delinquency petitions were numerous or increasingly serious (rule 4.421(b)(2)); that he was on parole at the time the crimes were committed (rule 4.421(b)(4)); and that his prior performance on probation or parole was unsatisfactory (rule 4.421(b)(5)).[4]

The trial court also acknowledged three mitigating circumstances: that the application of an enhancement could result in a sentence over 20 years (rule 4.423(b)(10)), that multiple enhancements were alleged (rule 4.423(b)(11)), and that an enhancement was based on a prior conviction over five years old (rule 4.423(b)(13)).

---

[4] Undesignated rule references are to the California Rules of Court.

The court further found, based on a letter from James's psychologist, that James "experienced psychological, physical, or childhood trauma, including but not limited to abuse, neglect, exploitation, or sexual violence," as provided in rule 4.423(b)(3). But the court observed that the letter did not conclude that these were factors in the commission of the crime as required by that rule.

The trial court next denied James's *Romero* motion to dismiss his prior strike convictions, which were both for second degree robbery. The court explained that, in exercising its discretion, it was required to consider James's criminal history and the nature of his offenses, as well as his background, character, and prospects. The court found that James had an extensive criminal record, consisting of numerous juvenile adjudications and felony convictions. The prior convictions included a robbery in which he pressed a firearm to a victim's head and another where he used a semiautomatic weapon to demand money at a gas station. Since the first robbery 22 years before, James had been out of custody for only about four years. The court noted the actual or threatened violence displayed in James's present offenses and found that he posed "a distinct, clear, and present danger to the public." As for his background, character, and prospects, the court found that James was 46 years old and that middle age was not a mitigating factor; it also found that James's involvement in three "major incidents" while in jail reflected his "character for violence and his propensity to commit serious crimes." The court again acknowledged James's childhood trauma and "psychological challenges" but found that they did not outweigh the previously identified factors. Based on these considerations, the court determined that James did not fall outside the spirit or purpose of the Three Strikes law.

The trial court then addressed its discretion to dismiss or impose lesser terms on the firearm enhancements found true under sections 12022.5, subdivision (a) and 12022.53, subdivision (b). Citing *People v. Rocha* (2019) 32 Cal.App.5th 352 and *People v. Orabuena* (2004) 116 Cal.App.4th 84, the court stated that, in considering

22

whether to strike the enhancements, it had to consider James's rights, the interest of society, the nature and circumstances of the current offenses, James's criminal record, and his background, character, and prospects. Addressing these considerations, the court found that it would be "contrary to the interest of justice" to dismiss the firearm enhancements in their entirety, reasoning that "any mitigating factors do not outweigh the Defendant's violent conduct." For the same reasons, the court also found that it would not be in the interest of justice to impose a lesser firearm enhancement under section 12022.53, subdivision (b) or to impose a low term for the firearm enhancement under section 12022.5, subdivision (a), again emphasizing "the nature of the crimes and the aggravating factors."

Finally, the trial court addressed its discretion to dismiss the section 667, subdivision (a) prior serious felony enhancements in whole or in part. The court recited the text of section 1385, subdivision (c)(1) and (2) and acknowledged three "possible" mitigating circumstances. First, the court noted that section 1385, subdivision (c)(2)(H) directs a sentencing court to strike an enhancement that is based on a prior conviction that is over five years old; and it found that both of James's prior convictions underlying the section 667, subdivision (a) enhancements were more than five years old. Second, the court noted that under section 1385, subdivision (c)(2)(B), where multiple enhancements are alleged in a single case, all but one enhancement shall be dismissed. Finally, the court observed that, while section 1385, subdivision (c)(2)(C) provides for the dismissal of an enhancement if its application could result in a sentence of over 20 years, here, it was the indeterminate sentences under the Three Strikes law—not any enhancement— that caused the sentence to exceed 20 years. Thus, that mitigating circumstance did not apply.

The trial court explained that, under section 1385, subdivision (c), courts must afford great weight to any of the applicable mitigating circumstances, which weigh greatly in favor of dismissing the enhancement unless dismissal of the enhancement

23

would result in physical injury or serious danger to others. (See § 1385, subd. (c)(2).) The court found that dismissal of the enhancements would endanger public safety in light of James's lengthy criminal history, noting that "despite several terms in state prison, upon release into the community, he resumed his conduct against members of the community by committing armed robberies, including the ones for which he was convicted in this case."

The trial court selected count six, the felony firearm possession, as the principal term and imposed an aggregate term of 14 years for that count: the middle term of two years, doubled due to the prior strikes, plus two five-year enhancements for both of the prior serious felony convictions (§ 667, subd. (a)). For each of counts one, two, and four (the robbery and attempted robbery offenses), the court imposed a sentence of 25 years to life, the indeterminate term required by the Three Strikes law (§ 667, subd. (e)(2)(A)(ii)), plus consecutive terms of 20 years, which included 10 years for the firearm enhancement (§ 12022.53, subd. (b)) and 10 years for the two five-year prior serious felony enhancements (§ 667, subd. (a)). For both counts three and five (the assault with a semiautomatic firearm offenses), the court imposed and stayed pursuant to section 654 an aggregate term of 29 years to life, which included the upper term of nine years, plus 10 years (the upper term) for the associated firearm enhancement (§ 12022.5, subd. (a)), plus 10 years for the two five-year prior serious felony enhancements (§ 667, subd. (a)). (See § 667, subd. (e)(2)(A)(iii).) And for count seven (misdemeanor resisting arrest), the court imposed a term of 360 days in county jail to run concurrent to count six. James's aggregate prison sentence was 74 years, plus 75 years to life in state prison.

The trial court recognized that it was "in effect imposing a sentence, which will result in Mr. James spending the rest of his life in prison based upon the Court's decision today and by not granting any leniency when it had the discretion to do so." But, the court stated, James's "track record indicates . . . that he is a present danger to society.

24

Throughout his adult life, he's inflicted trauma upon his victims, and despite his prior incarcerations, clearly lacks the insight and ability to reform or rehabilitate himself.  To be clear[,] the Court would decline to exercise its discretion to reduce the sentence even if the Defendant were to be subject to any subsequently enacted legislation while this case is on appeal."

B.

Effective January 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) (Senate Bill 81) added subdivision (c) to section 1385.  That provision states that, except in situations not at issue here, a trial court "shall dismiss an enhancement if it is in the furtherance of justice to do so."  (§ 1385, subd. (c)(1).)  It further provides that, in making this discretionary determination, "the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances" listed in the statute are present.  (§ 1385, subd. (c)(2).)  As relevant here, mitigating circumstances listed in section 1385, subdivision (c)(2) include that: "(B) Multiple enhancements are alleged in a single case," in which case, "all enhancements beyond a single enhancement shall be dismissed"; "(C) The application of an enhancement could result in a sentence of over 20 years"; "(E) The current offense is connected to prior victimization or childhood trauma"; and "(H) The enhancement is based on a prior conviction that is over five years old."  "Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (*Ibid.*)  " 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."  (*Ibid.*)  In *People v. Walker* (2024) 16 Cal.5th 1024, 1029, our Supreme Court explained, "if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of

25

countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' "

We review a trial court's decision whether to strike or reduce an enhancement under section 1385 for abuse of discretion. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.) " ' "[T]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377.) "The court is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) But " 'an abuse of discretion arises if the trial court based its decision on impermissible factors . . . or on an incorrect legal standard.' " (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225.)

James argues that the trial court abused its discretion in declining to dismiss, under section 1385, subdivision (c), the firearm enhancements and the prior serious felony enhancements. Specifically, he argues that the trial court failed to afford "great weight" to the mitigating circumstances he believes should have applied under section 1385, subdivision (c)(2)—namely, the presence of multiple enhancements, that an enhancement could result in a sentence over 20 years, connection of the current offenses to prior victimization or childhood trauma, and that an enhancement was based on a prior conviction more than five years old. (§ 1385, subd. (c)(2)(B), (C), (E), (H).) He further argues that the trial court applied an incorrect legal standard in determining his dangerousness to public safety (§ 1385, subd. (c)(2)) by focusing on his present dangerousness instead of his future dangerousness at the time of his release assuming the enhancements were stricken.

As an initial matter, we agree with the trial court that the statutory mitigating circumstance that "application of an enhancement could result in a sentence of over 20 years" (§ 1385, subd. (c)(2)(C)) did not apply. As the trial court explained, it was the application of the indeterminate sentences—not the imposition of the enhancements—that caused James's sentence to exceed 20 years. James argues that this factor applies "whenever the resulting sentence would be longer than 20 years, even if it is already so." This interpretation, however, is contrary to the plain text of the statute. A sentence of over 20 years does not "result" from an enhancement when the sentence already exceeds 20 years without any enhancement. (*Ibid.*)

The trial court nevertheless abused its discretion by applying incorrect legal standards in its consideration of the impact of the remaining mitigating circumstances on both sets of enhancements. As described above, the court separately addressed the question of dismissing the firearm enhancements and the question of dismissing the prior serious felony enhancements. Beginning with the firearm enhancements, we find affirmative record evidence that, in considering whether to dismiss those enhancements, the trial court failed to apply the standard required by section 1385, subdivision (c) as amended by Senate Bill 81. (See §§ 12022.5, subd. (c) [permitting dismissal of otherwise required firearm enhancement "in the interest of justice pursuant to Section 1385"], 12022.53, subd. (h) [same].) As explained above, section 1385, subdivision (c) requires that, absent a finding that dismissal would endanger public safety, courts must give great weight to the enumerated mitigating circumstances, which will ordinarily result in dismissal of an enhancement unless neutralized by countervailing factors. (§ 1385, subd. (c)(2); *People v. Walker*, *supra*, 16 Cal.5th at p. 1029.) The trial court, however, never mentioned that standard or the asserted section 1385, subdivision (c)(2) mitigating circumstances when considering the firearm enhancements. Instead, it expressly cited and relied on cases that predate Senate Bill 81; and its analysis focused entirely on the traditional section 1385, subdivision (a) factors, such as the nature and circumstances of

the current crimes, James's prior convictions, and his background, character, and prospects. (*People v. Orabuena*, *supra*, 116 Cal.App.4th at p. 99.) While those factors are relevant, a trial court must consider, and (absent a finding of danger to public safety) give great weight to, the applicable mitigating circumstances set forth in section 1385, subdivision (c)(2). Here, the court's ruling on the firearm enhancements gave no indication that it had done so—and indeed, the fact that the court opened its discussion of the prior serious felony enhancements by extensively quoting the text of section 1385, subdivision (c) affirmatively indicates that the court was introducing its discussion of what it viewed as a new and separate framework for analyzing the prior serious felony enhancements. But the same framework should have been applied when assessing the firearm enhancements as well.

Regarding the prior serious felony enhancements, as explained above, the trial court declined to dismiss those enhancements on the ground that doing so would endanger public safety. Here, too, we conclude that the court applied an incorrect legal standard in its analysis.

Initially, we reject the People's contention that James forfeited this issue by failing to assert the correct legal standard in the trial court. It is true that James's trial counsel did not offer the trial court any argument, either written or oral, on the proper legal standard for assessing whether dismissal of the enhancements would endanger public safety. He did, however, expressly request dismissal of the prior serious felony enhancements under section 1385, subdivision (c), and the court addressed that request. Given that ruling, and in light of James's alternative contention that any failure by trial counsel to make an adequate objection constituted ineffective assistance, we exercise our discretion to consider the issue. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [appellate courts may reach unpreserved questions]; *People v. Monroe* (2022) 85 Cal.App.5th 393, 400 [declining to find forfeiture to forestall ineffective assistance claim].)

On the merits, the parties appear to agree that the trial court applied an erroneous legal standard when concluding that dismissal of the prior serious felony enhancements would "endanger public safety." As explained in *People v. Gonzalez*, *supra*, 103 Cal.App.5th 215, which was decided after James's sentencing, trial courts deciding whether "dismissal of [an] enhancement would endanger public safety" (§ 1385, subd. (c)(2)) must "consider the impact to public safety if the defendant was granted sentencing relief" (*Gonzalez*, at p. 229). The plain text of the statute requires assessing whether "*dismissal of the enhancement* would endanger public safety," and whether "there is a likelihood that *the dismissal of the enhancement* would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2), italics added.) "Although the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence. A currently dangerous defendant who will be released from prison within a short timeframe might be found by the trial court to pose a greater danger to the public than a defendant who is currently dangerous but who has no prospect of release from prison until he is elderly." (*Gonzalez*, at p. 228.) This is a forward-looking inquiry requiring the trial court to "consider, among other things, the date on which the defendant would be released under the revised sentence, and, in the case of an indeterminate sentence, the safety valve that exists due to the review by the Board of Parole Hearings." (*Id.* at p. 229.) Applying this standard, the *Gonzalez* court found that the trial court abused its discretion by considering only whether the defendant currently posed a danger to the public, instead of also considering that, if the firearm enhancement at issue were dismissed, the defendant's 50-years-to-life sentence for murder would mean that he would not be released until far in the future, when he would be elderly, and his release would be subject to review by the Board of Parole Hearings and the Governor. (*Id.* at pp. 230-231.)

The reasoning of *Gonzalez* applies equally here, where the trial court was—excluding any enhancements—sentencing James, then age 46, to an indeterminate term of 75 years to life based on three consecutive third-strike sentences plus a four-year determinate term, making him eligible for parole at age 125. The court did not consider this fact, instead resting its analysis entirely on James's criminal record and history of armed robberies. While this criminal history and present dangerousness certainly were relevant (*People v. Gonzalez*, *supra*, 103 Cal.App.5th at p. 228), the court erred in failing to consider how dismissal of any of the enhancements would impact the length of James's sentence and his future dangerousness at the time of release.

The People do not attempt to defend the trial court's analysis of the public safety issue, instead urging that the error was harmless, obviating any need to remand for resentencing. We are not persuaded.

"[W]hen a court has not exercised its informed discretion, remand is the default 'unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 431, quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) "[U]nless there is a clear indication from the sentencing court that it would be idle to do so, remand for resentencing is required." (*Salazar*, at p. 431.)

The People argue that the trial court's finding that it would not be in the interest of justice to dismiss the firearm enhancements provides the necessary clear indication that it also would have found that dismissing the prior serious felony enhancements would not be "in the furtherance of justice" (§ 1385, subd. (c)(1)), even without finding a danger to public safety. As we have explained, however, the court did not apply the necessary section 1385, subdivision (c) framework to its analysis of the firearm enhancements. Although, as the People argue, the rule 4.421 aggravating factors found true were more numerous than the statutory mitigating factors the court identified in assessing the prior serious felony enhancements, the court's ruling nowhere indicates how it would decide

the issue if it gave the requisite "great weight" to the applicable mitigating factors. (§ 1385, subd. (c)(2).)

In *People v. Salazar*, *supra*, 15 Cal.5th at page 431, our state high court made clear that reliance on surrounding sentencing decisions, such as "declining to strike enhancements, is not sufficient to provide a clear indication of what a sentencing court might do on remand if it had been fully aware of the scope of its discretionary powers." In this case, the trial court's decision not to strike any firearm enhancements, without applying the correct legal standard, gives no indication of how it would rule on either the firearm enhancements under the proper standard or the prior serious felony enhancements without limiting the section 1385, subdivision (c)(2) inquiry to James's current dangerousness.

The People also assert that the trial court's "decisions and remarks at the sentencing hearing" show that remand would be futile. The People highlight the court's statement of its awareness that it was in effect imposing a life sentence "by not granting any leniency when it had the discretion to do so," as well as its concluding statement that, "[t]o be clear[,] the Court would decline to exercise its discretion to reduce the sentence even if the Defendant were to be subject to any subsequently enacted legislation while this case is on appeal." These comments give no indication of how the court would rule if it had applied the correct legal standards. Remand for resentencing is therefore required. (*People v. Salazar*, *supra*, 15 Cal.5th at p. 431.)

31

## DISPOSITION

The sentence is vacated, and the case is remanded for resentencing consistent with this opinion.  The judgment is affirmed in all other respects.


/s/_____
FEINBERG, J.



We concur:



/s/_____
DUARTE, Acting P. J.



/s/_____
WISEMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.